IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JOHN C. COVINGTON,

      Plaintiff,

v.                                CASE NO. 2:08-cv-0930

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  This case is presently pending before the court on briefs in support of judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, John C. Covington (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on December 15, 2004, alleging disability as of December 7, 2004, due to hydrocephalus on brain, headaches, blurred vision, pain in the back, hips, and legs, high blood pressure, and irregular heart beat.  (Tr. at 13, 130, 133-35, 136-40, 141-43, 144-46, 176-83, 204-10, 235-41, 245-52.)  The claims were denied initially and upon

reconsideration.  (Tr. at 13, 64-68, 69-73, 74-78, 83-85, 86-88.)
On May 10, 2007, Claimant requested a hearing before an
Administrative Law Judge ("ALJ").  (Tr. at 89.)  The hearing was
held on January 18, 2008, before the Honorable Valerie A. Bawolek.
(Tr. at 99, 23-58.)  By decision dated March 28, 2008, the ALJ
determined that Claimant was not entitled to benefits.  (Tr. at 13-
22.)  The ALJ's decision became the final decision of the
Commissioner on July 10, 2008, when the Appeals Council denied
Claimant's request for review.  (Tr. at 2-5.)  On July 17, 2008,
Claimant brought the present action seeking judicial review of the
administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a
claimant for disability benefits has the burden of proving a
disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir.
1972).  A disability is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable impairment which can be expected to last for a
continuous period of not less than 12 months . . . ."  42 U.S.C. §
423(d)(1)(A).

The Social Security Regulations establish a "sequential
evaluation" for the adjudication of disability claims.  20 C.F.R.
§§ 404.1520, 416.920 (2002).  If an individual is found "not
disabled" at any step, further inquiry is unnecessary.  Id. §§
404.1520(a), 416.920(a).  The first inquiry under the sequence is

2

whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f)(2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574

3

(4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 15.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of chronic lumbosacral strain and degenerative disc disease. (Tr. at 15-18.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 18-20.) The ALJ concluded that Claimant could return to his past relevant work as a packer. (Tr. at 21.) Nevertheless, the ALJ chose to proceed with the sequential evaluation process and concluded that Claimant could perform jobs such as vacuum tester, bottle packager, and non-postal mail sorter which exist in significant numbers in the national economy. (Tr. at 21.) On this basis, benefits were denied. (Tr. at 22.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular

4

> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was forty years old at the time of the administrative hearing. (Tr. at 27.) He is a high school graduate with some vocational training in the United States Army, from which he was not honorably discharged. (Tr. at 28.) In the past, he worked at twenty different jobs with twenty different employers from 1992 to 2006, including small parts packer, warehouse packer (Halloween masks), gluing machine operator, cutting machine operator, stripping cutting machine operator, assembler, and spray cleaner. (Tr. at 50-52.)

5

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record. Claimant's argument on appeal concerns only the impairments of hydrocephalus and headaches. Therefore, the undersigned will summarize the medical evidence of record concerning only these impairments below.

On February 8, 2005, Michael F. Nido, P.A., Carolina Neurosurgery and Spine Associates, examined Claimant and reported:

> We feel that his back pain is related to degenerative disease and there is no surgical intervention indicated by the MRI. We have thus recommended a conservative course of treatment. However, more importantly with regard to his aqueductal stenosis, we feel that this needs attention and thus we feel that he would benefit from a third ventriculostomy. We explained the procedure in detail... They appear to understand and wish to proceed. We will therefore schedule him for performance of a third ventriculostomy with placement of a ventricular access device as soon as is feasible.

(Tr. at 330.)

On February 10, 2005, Tyler I. Freeman, M.D., provided a consultative examination report for the North Carolina Disability Determination Services. (Tr. at 266-68.) Dr. Freeman examined the Claimant on January 27, 2005 and stated that Claimant's medical "history was obtained entirely from the claimant." (Tr. at 266.) Dr. Freeman provided this summary:

> Mr. John Covington is a 37-year old male with a diagnosis of congenital hydrocephalus recent and recent MRI to be performed for his lower back. He has seen a chiropractor and has [been] seen at Carolina Neurosurgery. General physical examination is unremarkable. The blood pressure is 130/90. The hips, knees and cervical have limited

6

> range of motion.  The straight leg raising is positive
> bilaterally in supine position at 15 degrees.
> Prognosis
> The patient's prognosis is guarded.  Based on the
> patient's current impairments, they may affect his
> ability to sit or stand for prolonged lengths of time,
> move about, lift, carry, and handle objects.  The patient
> may need an endoscopic third ventriculostomy for
> intracranial CSF diversion.

(Tr. at 268.)

On February 11, 2005, a State agency medical source completed a Physical Residual Functional Capacity Assessment ("PRFCA") and opined that Claimant could perform medium work with only two postural, manipulative, visual, communication, or environmental limitations - that he could only occasionally stoop and crouch. (Tr. at 258-65.)  The evaluator, Robert Gardner, M.D., a Disability Determination Medical Consultant, noted:

> Diagnosis: congenital hydrocephalus, bulging disc L4-5
> Objective Evidence: 1/27/05 - normal ambulation; gets
> on/off table w/o assistance; VA 20/25; BP 130/90; normal
> HEENT; normal neck, lungs, cardiac, abdomen; no edema;
> knee flexion 90, hip flexion 45, generalized decrease ROM
> in CS; SLR + at 15; all other joints normal; DTR's
> normal; cranial nerves and sensory intact; str 5/5; diff
> w/heel to toe and squat and rise; normal grip and manip;
> dx: congenital hydrocephalus.
> RFC Conclusion: Claimant has alleged impairments somewhat
> limiting functioning.  Claimant has spinal pain with
> radiation to LE's and LOM.  Remainder of exams grossly
> normal w/ full str, intact neuro and unassisted
> ambulation.  Medical evidence, along w/ claimant's
> statement of pain, indicate limitation to medium exertion
> w/ occ stooping and crouching given back issues.

(Tr. at 265.)

On February 23, 2005, Claimant underwent an endoscopic third ventriculostomy with placement of ventricular access device.

Michael D. Heafner, M.D., performed the surgery.  He stated:

> This is a 37-year-old gentleman with a history of
> headaches and some back pain, who was discovered to have
> hydrocephalus on CT scan, and subsequent MRI scan
> revealed aqueductal stenosis.  He was, thus, offered
> third ventriculostomy to help with his headaches.  The
> patient also has some lumbar degenerative disease at L4-
> 5, which is not felt to be surgical at this time...The
> patient...tolerated the procedure well.

(Tr. at 286-87.)

On June 6, 2006, Mark J. Bullard, M.D., Emergency Department

of the Carolinas Health Care System, evaluated Claimant.  (Tr. at

271.) Dr. Bullard noted:

> complaint of a headache, "pressure on the head."  He
> states this headache started two weeks ago and he has one
> intermittently [illegible] with gradual onset.  Mostly
> right-sided in nature and intermittent.  He states he has
> headache now.  It is worse with standing.  The patient
> states he has some dizziness and nausea and says this is
> consistent with his hydrocephalus that was diagnosed in
> February 2005, he subsequently had a shunt placed by Dr.
> Heffer.  The patient denies fevers or chills, URI.
> States he has a little nausea but no nausea or vomiting
> here...
> NEUROLOGIC: Cranial nerves II through XII are without
> focal abnormality.  The patient had a normal finger-to-
> nose, normal Romberg, no drift.  Normal rapid alternating
> movements.  The patient's fundi were without papilledema.
> Normal gait with turn.
> DIAGNOSTIC STUDIES: The patient subsequently underwent CT
> which showed no acute findings, which was stable since
> the patient had a scan 01/25/06.  The patient does have
> a ventriculostomy drain on the right, otherwise
> unremarkable findings.
> EMERGENCY DEPARTMENT COURSE: Medical decision making:
> This is a 38-year-old gentleman with headache.  The
> patient does not have any evidence of hydrocephalus here.
> I do not think this gentleman has meningitis.  The
> patient has a normal neurologic examination, is afebrile.
> The patient had his pain relieved after Compazine and
> Toradol here.  Follow up with PMD.
> DIAGNOSIS: Headache.

(Tr. at 271.)

On June 7, 2006, a CT Head Scan without contrast was performed on Claimant at Dr. Bullard's request.   Gary DeFilipp, M.D., radiologist, states:

> Sections cover from the base to the high convexity region.   The study is compared to the prior CT of 01/25/2006.   A ventricular drainage catheter enters the right lateral ventricle from a frontal approach.   The catheter tip is at the level of the base of the right frontal horn.   The ventricles are upper normal in size and normal in configuration.   A brain parenchymal lesion is not consistent with a moderate sized retention cyst. No other findings are identified.
> IMPRESSION:  Status post ventricular shunting.   The ventricles are upper normal in size.   No change is seen from the prior CT of 01/25/06.

(Tr. at 284.)

On October 25, 2006, Kip Beard, M.D. provided a consultative examination report for the West Virginia Disability Determination Service.   (Tr. at 343-38.)   Dr. Beard examined Claimant and reviewed medical records.   He provided this summary:

> The claimant is a 39-year-old male with history of chronic headaches.   According to the records he provided today, he was found to have aqueductal stenosis with obstructive hydrocephalus that was thought to be related to prior closed head injury.   He underwent implantation of a ventricular access device in February 2005.   He had about a few months of improvement but does complain of recurrent headaches.   Neurologic exam was unremarkable in relation to that.
>
> Regarding the hypertension, the claimant's blood pressure was elevated today.   He is not on medications currently. I do not appreciate any end organ damage related to hypertension.
>
> Regarding the irregular heartbeat, the claimant has been asymptomatic with this.   Examination today revealed

9

regular rate and rhythm.

Regarding the back pain, examination today reveals some complaints of moderate pain on forward bending and some limited forward bending secondary to this.  Straight leg raising produced some radicular complaints only in the seated position on the left side.  Neurologic exam revealed no weakness, sensory loss or atrophy.  The reflexes were symmetric and there was no evidence of radiculopathy.  The claimant's gait was a bit slow and guarded in appearance with complaints of back pain.  He did not present with or require ambulatory aids.

(Tr. at 347-48.)

On October 28, 2006, Claimant was admitted to Plateau Medical Center with complaints of a sudden onset of headache and chest pain that occurred when he was having a bowel movement the previous evening.  Sanjay R. Mehta, D.O., evaluated Claimant and reported:

The patient recently moved to this area in June of 2006. He has no local physician.  He continues to have residual headache... When he was evaluated in the Emergency Room and (sic) he was chest pain free.  He was placed on a Nitro Patch... The patient was admitted to the telemetry bed.  He had an unremarkable hospital course.  He was having just a very slight residual headache at the time of discharge.  He remained chest pain free. He remained in normal sinus rhythm on telemetry.  Cardiac markers were within normal limits.  The EKG was also normal sinus rhythm, no acute changes... The patient was discharged home today.  He was advised that he may follow-up at New River Family Health Center on a p.r.n. basis for medical treatment.  He was not given a guarantee that he would be supported in his disability however.

(Tr. at 351.)

On November 3, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment ("PRFCA") and opined that Claimant could perform sedentary work with the postural limitations that he could never climb ladder/rope/scaffolds,

10

balance, or crawl and could occasionally climb ramp/stairs, stoop, kneel and crouch. Claimant had no manipulative, visual, or communicative limitations, but was to avoid concentrated exposure to all the environmental limitations. (Tr. at 363-70.) The evaluator, A. Rafael Gomez, M.D. noted:

> Patient is fully credible. He was found to have obstructive hydrocephalus in 01/05 due to an old brain injury and had craniotomy with ventricular access device (shunt) in 02/05. Patient continues to have episodes of severe headaches, dizziness, tinnitus. The neurological exam was reported normal except for a slow gait. He has uncontrolled HTN. Due to nature of the disease and the operation plus residual episodes, patient is reduced to sedentary work.

(Tr. at 368.)

On November 28, 2006, Mariana Didyk, P.A.-C., New River Health Association, stated that Claimant presented to the clinic, provided his medical history: "Comes in today mainly to get his medical card... Form will be sent in for patient and he may return when he gets his medical card for further workup and treatment and possible referral to specialist in this area. Patient voices understanding and agreement with plan." (Tr. at 372.)

On January 17, 2007, Ms. Didyk stated that claimant complained of recent episode of increase in low back pain:

> He is requesting some pain relief...
> **General**: In no acute distress...BP - 120/80...
> **Impression**: 1. Low back pain. 2. Headaches.
> **Plan**: Patient is given Ultram 50 mg two PO q. 4-6.h. PRN for pain, #80 and also referral to neurosurgeon in this area for reevaluation of his hydrocephalus. Patient is going to get a medical card so that we can proceed with these referrals.

11

(Tr. at 371.)

On April 11, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment ("PRFCA") and opined that Claimant could perform light work with the postural limitations that he could never climb ladder/rope/scaffolds, or balance, and could occasionally climb ramp/stairs, stoop, kneel, crouch, and crawl. Claimant had no manipulative, visual, or communicative limitations. Claimant had no environmental limits except to avoid concentrated exposure to extreme cold and hazards. (Tr. at 386-93.) The evaluator, Rogelio Lim, M.D. noted:

> allegations credible but does not meet listing level. Hx [history] of obstructive hydrocephalus last 1-005 due to trauma, old brain injury corrected by ventricular shunt last 2-005 with good result but continues to have headache, dizziness and tinnitus but neuro findings revealed normal except for mild slow gait but normal adl [activities of daily living]. Hx of hypertension but no end organ damages. Mild arrythmia in the form irregular heartbeat but no limiting. Low back pain but no radiculopathy. No motor weakness and full use of upper and lower limbs without limitations and no assistive device. Alleges headache but does not take any medications for alleged headache. Full ambulatory but gait mildly slow but no limp.

(Tr. at 393.)

In a facsimile stamped August 13, 2007, Barry K. Vaught, M.D. thanked Ms. Didyk for her referral of the Claimant and provided an attachment of his consultation notes related to Claimant. The consultation notes dated April 11, 2007 state:

> Thirty-nine year old man referred by Dr. Didyk for evaluation of headaches...history of obstructive hydrocephalus, presumably due to the head trauma, status

12

post some intracranial procedure, although I do not have the details. His neurological examination today is essentially normal aside from a flat affect. I suspect that his current headache is related to the obstructive hydrocephalus but fueled by analgesic overuse. In hopes of reducing his current problems, I would like to start him on Ultracet to be used no more than four times per week and a static dose of amitriptyline in hopes of reducing his headache frequency. We will refer him to a neurosurgeon for evaluation of his shunt. Initially, I thought maybe his symptoms were due to over-shunting, but it is not clear to me that he has had any sort of drainage into his peritoneum of this. He will follow up her in six weeks, but was urged to call if there are any problems in the meantime.

(Tr. at 401-02.)

Dr. Vaught's consultation notes dated May 24, 2007 state:

At the last visit, we started him on amitriptyline and titrated up to the current dose. He reports that it has reduced the frequency of his headaches but not the severity. He takes Ultracet when the headaches occur and reports that this helps relatively well. He has had no side effects from either of these medications. Treatment 1. Headaches - Start amitriptyline tablet, 50 mg, orally, 30, 1 tab(s), once a day (at bedtime), 30 day(s), Refills 3. Continue Ultracet table, 325 mg - 37-5 mg, orally, 30, 1 tab(s), q6h prn headache, NTE 4 in one week, Refills 2. This is a 39-year-old man with history of obstructive hydrocephalus whose headaches are under relatively good control on the current regimen. We will increase the amitriptyline to 50 mg h.s. and then he will continue using Ultracet for pain. He is to follow up at WVU for evaluation of his shunt. It is apparent from the records that he had a shunt installed but no peritoneal drain. I am not sure of what the purpose of this device is for. Hopefully, they will be available [sic; able] to shed some light on this. He will follow up here in six weeks but was urged to call if there are any problems in the meantime.

(Tr. at 397-99.)

Dr. Vaught's consultation notes July 3, 2007 state:

He continues to have headaches, but they are now every

13

few days which represents an improved frequency.  He has
been tolerating the amitriptyline but ran out a couple of
weeks ago and so has not been taking the medication.  He
continues to take tramadol which he says improves his
symptoms considerably.  His headaches are sometimes worse
in the morning and sometimes worse in the evening and
again, do not occur every day...
**Treatment** 1. Headache - Continue amitriptyline tablet, 25
mg, orally, 30, 1 tab(s), once a day (at bedtime), 30
day(s), Refills 3.  This is a 39-year-old man with a
history of aqueductal stenosis and obstructive
hydrocephalus who has headaches since he had this first
bout with these problems.  In hopes of reducing his
headaches, we will start him back on Elavil at 50 mg
q.h.s., and I had urged him to continue taking the Ultram
as needed.  He will follow up at WVU in the Neurology
Clinic.  Follow Up 2 months.

(Tr. at 395-96.)

On May 29, 2007, Charles Rosen, M.D., West Virginia
University ["WVU"] Department of Neurosurgery, reported to Dr.
Vaught stating:

The patient complains of twice a week headaches,
occasional blurry vision and tinnitus.  This has been
occurring for the past year.  The patient moved to
Beckley and has not had followup with neurosurgery.  He
has not seen an opthalmologist or neuro-opthalmologist
since 1989.  His last MRI of his brain was in 2005.  The
patient did come with a CT scan of the head, which shows
no significant hydrocephalus.  He does have full
ventricles...We will schedule these tests.  We will also
schedule the patient to see a neuro-opthalmologist for
routine evaluation of his vision.

(Tr. at 413-14.)

On July 31, 2007, Dr. Rosen reported to Dr. Vaught:

This is a letter regarding your patient who is a 39-year-
old male status post third ventriculostomy and VP shunt
placement for aqueductal stenosis performed in February
2005 in North Carolina.  The patient had preoperatively
been experiencing headaches and blurry vision following
the placement of the shunt.  Symptoms have improved,

14

> however, he feels they have been returning recently since
> about two months after his VP shunt placement...The
> symptoms have been occurring since 2005 around the same
> time as the headaches and hydrocephalus.  He finds that
> his pain is made more severe with bending or lifting and
> decreases with lying supine.  He reports that his
> symptoms stem from the blow to the nose while in the
> military.  He was told by a surgeon who [did the] repair
> of his nose at the time that this injury causes
> hydrocephalus... The patient was asked to undergo an MRI
> of his lumbosacral spine as well as his brain with and
> without contrast and return to our clinic.  The patient
> attempted to undergo these studies but was not able to do
> to the fact that no information could be found regarding
> the type of shunt the patient has, and our facility will
> not perform studies unless this information is
> determined.  Apparently the record(s) were lost, and
> there is no knowledge of the patient's type of shunt that
> was placed [because] his surgeon retired.

(Tr. at 403.)

On August 7, 2007, Brian D. Ellis, M.D., Associate Professor

and Director, Neuro-Opthalmology Service, WVU Department of

Opthalmology, reported to Dr. Rosen that he had evaluated Claimant

in his Neuro-Opthalmology Clinic.  He found:

> On examination performed on August 7, 2007, his visual
> acuity with correction is noted to be 20/25-1 right eye
> and 20/20 left eye... He seems to be doing well from the
> eye standpoint.  There is specifically no papilledema or
> dorsal midbrain signs.  I told him to make sure we follow
> up on him and make sure that we get a fundus examination
> at that time, as well as to recheck his iris nevus left
> eye.  He has some astigmatism left eye, which is very
> mild.  I will see him back in six months unless he
> notices any interim symptoms  change in his eyes.

(Tr. at 404-05.)

On September 5, 2007, Dr. Rosen and Leah Holloran, P.A.-C.,

reported to Dr. Vaught:

> Dr. Rosen reviewed the patient's most recent CT of the

15

brain with and without contrast and noted stable ventricle size. Shunt was intact. CT myelogram of the lumbosacral spine showed degenerative disk disease at L4-L5 with disk bulge. No significant nerve root compression. [Tr. at 417.]

Diagnosis: 1. Status post VP shunt placement after a third ventriculostomy at an outside facility.
2. Degenerative disk disease of the lumbosacral spine resulting in low back pain and lower extremity pain.

Plan for Treatment: Dr. Rosen felt the patient would not require surgery for his lumbosacral spine. He recommended a course of physical therapy focusing on active modalities such as strengthening, stretching, conditioning along with use of nonsteriodal anti-inflammatory medications, which we will defer to your expertise, Dr. Vaught. Dr. Rosen discussed the patient's headaches and the severity versus evaluation with invasive testing. The patient felt that his headaches were not to the degree and he wanted to pursue further testing. We will see him back in one year's time with a CT of the brain with and without contrast since we cannot find any documentation regarding the type of valve the patient has in place from his shunt and our facility will not perform MRIs without this information. The patient was advised to contact us sooner with questions or problems.

(Tr. at 415-16.)

On September 19, 2007, Dr. Vaught reported that Claimant returned to his office for followup regarding his headaches:

He is currently on amitriptyline 50 mg at bedtime and he reports that his headache frequency had decreased to two times per week. He does take Ultracet for his headaches when he does get them and reports that this readily improves these. He is being followed by the Neurosurgery Department at WVU. He has recently seen them in September 2007 and they did a CT scan of the head which revealed that he was stable in regards to his obstructive encephalopathy...He denies any excessive somnolence or any other problems. He reports his headache frequency has decreased from once a day to two times per week which he is currently pleased with. We will make no changes in his program and continue him on

16

the amitriptyline and use the Ultracet for abortive headache measures.

(Tr. at 420-22.)

The record includes the Progress Notes of Surayia T. Hasan, M.D., covering the period from November 6, 2007, through March 25, 2008.  These notes show that Claimant is being treated for backache with radicular pain and breathing problems related to smoking.  (Tr. at 430-32.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to give controlling weight to the opinion of Dr. Vaught regarding Claimant's severe impairments of hydrocephalus and headaches. (Pl.'s Br. at 10-13.)

The Commissioner argues that substantial evidence supports the ALJ's determination that Plaintiff's headaches/hydrocephalus was not a "severe" impairment.  (Def.'s Br. at 9-11.)

Evaluating Opinions of Treating Sources and "Severe" Impairments

Claimant asserts that the ALJ failed to give controlling weight to the opinion of Dr. Vaught regarding Claimant's severe impairments of hydrocephalus and headaches.  (Pl.'s Br. at 10-13.) Specifically, Claimant argues that

> It is clear that the ALJ in this case did not perform the required series of tests specified by the regulations with respect to whether the plaintiff's headaches and hydrocephalus are severe impairments.  No mention was made by the ALJ of the length of the treatment

17

relationships, the extent of the treatment or specialization of the doctors providing opinions on functional capacity and not persuasive evidence as to why she found Dr. Marshall's testimony, whose opinion is based on the claimant's treating physicians, Dr. Vaught's and Dr. Rosen's opinions as stated in their records and reports, entitled to greater weight than the opinions of the treating physicians...The ALJ's decision fails to give substantial weight to the opinion of Dr. Vaught, whose opinion regarding the continuing existence of headaches, dizziness, and tinnitus are supported by the opinions of the treating physician...

A fair reading of the medical evidence will show that the plaintiff's hydrocephalus and headaches may significantly limit an individual's ability to work... Further, the ALJ cites that her rejection of the hydrocephalus and headaches as "severe" impairments is based in part on her findings that the plaintiff was satisfied with his condition and his treatment were not supported by the record.  The credibility of the claimant's subjective complaints which were both exertional and non-exertional would appear to be supported by the record.  The credibility of the claimant's subjective complaints does support a finding that these conditions are "severe" within the meaning of the regulations.

(Pl.'s Br. at 12-13.)

The Commissioner responds that Claimant's assertions have no merit because the ALJ complied with the regulations when he weighed the opinions of Dr. Vaught and properly concluded that Plaintiff's headaches/hydrocephalus was not a "severe" impairment. (Def.'s Br. at 9-11.)  Specifically, the Commissioner argues:

The ALJ found that Plaintiff's hydrocephalus and headaches were not severe impairments, noting that Plaintiff's headaches were controlled with medication and that he declined further testing (Tr. 17)... substantial evidence supports the ALJ's finding of non-severe headaches... Medical expert, Dr. Marshall, clearly testified at the administrative hearing that there was no evidence of continuing hydrocephalus, that the problem had been taken care of, and that there was no explanation for Plaintiff's complaints of headaches (Tr. 43-

44, 46).

Dr. Marshall's testimony is supported by treating doctors in the record. Dr. Bullard confirmed in June 2006 that there was no evidence of hydrocephalus (Tr. 271, 285). In October 2006, Dr. Beard reported that Plaintiff's neurological examination was unremarkable with respect to his complaint of headaches (Tr. 347). Dr. Mehta reported a normal examination in October 2006 (Tr. 351). Dr. Lim noted in April 2007 that Plaintiff did not take any medication for his alleged headaches (Tr. 391). Dr. Vaught, Plaintiff's neurologist, reported in April 2007 that Plaintiff's neurological examination was normal (Tr. 401). A CT scan taken in September 2007 showed stable ventricle size and an intact shunt (Tr. 415, 417)...

After Plaintiff came under the care of Dr. Vaught, who prescribed Amitriptyline to prevent the onset of headaches, and Tramadol, Elavil, and Ultram, for headache pain, these medication all resulted in improvement of Plaintiff's overall condition and symptoms (Tr. 395-96, 398, 420). Plaintiff also admitted at the hearing that the headaches were usually controlled with medication (Tr. 32). Therefore, even if Plaintiff had a headache, the pain was relieved with medication. A headache that is treated and relieved with medication does not significantly limit one's ability to perform work activities; and, hence, is not a "severe" impairment.

The most telling evidence mitigating against finding that Plaintiff's headaches are "severe," is the fact that Plaintiff declined options that neurosurgeon, Dr. Rosen, offered in September 2007 to determine the cause of his alleged headaches (Tr. 416). If Plaintiff's headaches were truly as bad as he would have the ALJ believe, then he would choose to pursue any and all options in the hopes of gaining relief. He would not be so quick to decline the pursuit of further testing when it would be of great benefit to him. The ALJ discussed these reasons in the decision (Tr. 18-19). The only reasonable conclusion to draw on the basis of all of this evidence is that Plaintiff's headaches are not "severe," as the Agency defines that term.

(Def.'s Br. at 9-11.)

Under current law, a severe impairment is one "which significantly limits your physical or mental ability to do basic

work activities." 20 C.F.R. § 404.1520(c) (2006); <u>see also</u> 20 C.F.R. § 404.1521(a) (2006); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-41 (1987) (recognizing change in severity standard). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b) (2006). Examples of basic work activities are:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

<u>Id.</u>

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. <u>See</u> 20 C.F.R. § 404.1527(d)(2) (2006). Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. §

20

404.1527(d)(2) (2006).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). However, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight generally is given to an

21

examiner than to a non-examiner.  Section 404.1527(d)(2) provides
that more weight will be given to treating sources than to
examining sources (and, of course, than to non-examining sources).
The Fourth Circuit Court of Appeals has held that "a non-examining
physician's opinion cannot by itself, serve as substantial evidence
supporting a denial of disability benefits when it is contradicted
by all of the other evidence in the record."  Martin v. Secretary
of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir.
1974); Hayes v. Gardener, 376 F.2d 517, 520-21 (4th Cir. 1967).
Thus, the opinion "of a non-examining physician can be relied upon
when it is consistent with the record."  Smith v. Schweiker, 795
F.2d 343, 346 (4th Cir. 1986).

The undersigned has thoroughly reviewed all the medical
records, and finds that the ALJ fully and correctly considered Dr.
Vaught's opinions, as well as those of the consultative examining
physicians and the state agency record-reviewing medical sources of
record in determining Claimant's physical status regarding
hydrocephalus and headaches.  In review, the ALJ found:

> The claimant reports having pressure in his head for
> several years, and on January 25, 2005, the impressions
> included mild hydrocephalus, probably secondary to
> aqueductal stenosis.  On February 8, 2005, the claimant
> continued to complain of persistent headache.  He
> reported going to bed at night with a headache and waking
> up in the morning with a headache.  On February 23, 2005,
> the claimant underwent an endoscopic third
> ventriculostomy with placement of ventricular access
> device as a result of obstructive hydrocephalus due to
> aqueductal stenosis.  On June 6, 2006, the claimant
> complained of headache, and on June 7, 2006, he underwent

22

a CT scan of the brain, which revealed status post ventricular shunting. The claimant had a normal neurological examination, and his pain was relieved after Companzine and Toradol. The diagnosis was headache (Exhibit 3F).

On October 25, 2006, the claimant underwent a consultative physical examination and reported that his headaches had recently recurred. He reported having at least three of these headaches a week, which last four to six hours at a time. The claimant's neurological examination was unremarkable. The impressions included posttraumatic, obstructive hydrocephalus due to aqueductal stenosis; status post implantation of ventricular access device and chronic headaches secondary to hydrocephalus (Exhibit 4F).

On October 28, 2006, the claimant sought emergency room treatment with complaints of sudden onset of headache and chest pain when he was having a bowel movement. When he was evaluated in the emergency room, he was chest pain-free and was placed on a Nitro patch. He was admitted for observation; however, he remained chest pain-free with normal sinus rhythm and no acute changes. Cardiac markers were within normal limits, and his EKG also revealed normal sinus rhythm with no acute changes. He was discharged on the same date with only a very slight residual headache (Exhibit 5F). On November 28, 2006, the claimant was examined by Mariani Didyk, PA-C, at the request of the West Virginia Department of Health and Human Resources. Ms. Didyk's diagnosis included headaches due to hydrocephalus (Exhibit 7F).

On April 11, 2007, the claimant underwent a neurological evaluation by Barry K. Vaught, M.D. The claimant reported nearly daily headaches that are frontal and pressure-like in character. He reported taking Voltarin and Flexeril, which had helped somewhat. His neurological examination was essentially normal. Dr. Vaught suspected the claimant's current headache is related to the obstructive hydrocephalus but fueled by analgesic overuse. Dr. Vaught started the claimant on Ultracet to be used no more than four times per week and a static dose of Amitriptyline. On May 24, 2007, Dr. Vaught reported the claimant's headaches were under relatively good control on the current regimen. The claimant's Amitriptyline dose was increased, and he was instructed to continue using Ultracet for pain. On July

3, 2007, the claimant reported improved frequency of his
headaches; however, he reported running out of
Amitriptyline and had not been taking the medication. He
was instructed to restart the Amitriptyline and to
continue taking Ultram as needed (Exhibit 10F). A CT
scan of the brain on September 4, 2007 demonstrated post-
treatment changes of the ventricular catheter (Exhibit
17F). On September 4, 2007, Charles Rosen, M.D.
discussed the claimant's headaches and the severity
versus evaluation with invasive testing. The claimant
felt that his headaches were not to the degree that he
wanted to pursue further testing. Accordingly, the
claimant was instructed to return for follow-up in one
year (Exhibit 16F). On September 19, 2007, the claimant
reported headaches only twice per week and that the
Ultracet readily improves these (Exhibit 20F).

The record indicates the claimant has headaches as a
result of hydrocephalus. However, when he is compliant
with his medication regimen, his headaches are
controlled. Furthermore, the claimant declined further
testing, indicating he was satisfied with his current
condition and treatment regimen. Accordingly, the
undersigned finds the claimant's hydrocephalus and
headaches are not severe impairments.

(Tr. at 16-17.)

As stated earlier, a treating physician's opinion is afforded
"controlling weight only if two conditions are met: (1) that it is
supported by clinical and laboratory diagnostic techniques and (2)
that it is not inconsistent with other substantial evidence." Ward
v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R.
§ 404.1527(d)(2) (2006).

The undersigned finds that the ALJ did consider the evidence
of record from Dr. Vaught and weighed his opinions in keeping with
the applicable regulations. The record supports that the ALJ did
not err in assessing Dr. Vaught's opinions and in finding that his

24

conclusions did not demonstrate that Claimant's hydrocephalus and headaches are severe impairments.  (Tr. at 17.)

In the Brief in Support of Judgment on the Pleadings, Claimant asserts that he has additional evidence from Dr. Vaught in which Dr. Vaught "disagrees with the opinion of the medical expert witness."  Claimant brief stated:

> On July 10, 2008, the Appeals Council denied the plaintiff's request for review of the ALJ's decision without having the opportunity to consider Dr. Vaught's April 29, 2008 report since it was not listed as additional evidence considered in connection with the decision despite its submission with other evidence that was listed and considered (TR 2-6).

(Pl.'s Br. at 10.)

The undersigned has reviewed the April 29, 2008 letter of Dr. Vaught provided by Claimant's representative on October 29, 2008. The letter is written "To Whom It May Concern" and states in its entirety:

> I am writing this letter in regards to Mr. Covington, who is following in my clinic for chronic headaches.  He has a history of acute hydrocephalus, which required placement of a ventricular peritoneal shunt.  He has had continued headaches even after placement of the shunt and there has been some apparent contention that his headaches should have resolved following resolution of his hydrocephalus.
>
> In my opinion, the headaches may be lifelong following acute hydrocephalus, and residual head pain is often associated with VP shunt placement.  As such, I think that it is faulty logic to assume that the headaches should resolve just because the acute hydrocephalus has resolved.  If I can elaborate in any regard, please do not hesitate to contact me.

(Docket No. 13, page 2.)

25

The undersigned finds that this additional evidence is not persuasive evidence that Claimant's hydrocephalus and headaches are severe impairments or that the ALJ failed to properly evaluate the opinions of Dr. Vaught. A severe impairment is one "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c) (2006). The objective medical evidence does not show that Claimant's hydrocephalus and headaches impairment resulted in significant functional limitations. The substantial evidence of record, including that from Dr. Vaught, Dr. Rosen, Dr. Marshall and the State agency nonexamining medical sources, does not indicate that Claimant suffers from a severe hydrocephalus and headaches impairment. As the ALJ reasoned in his decision, Dr. Vaught's opinions confirm the objective evidence of record from the above examining and nonexamining sources that Claimant's headaches were relatively well controlled under his current medication regimen and his neurological examinations were essentially normal.

The ALJ's findings related to Dr. Vaught are in keeping with the applicable regulations related to the weight afforded medical opinions, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). Furthermore, the ALJ did not err in failing to find Claimant's hydrocephalus and headaches impairment to be severe, as the substantial evidence of record indicates such an impairment is not severe.

Substantial evidence supports the Commissioner's decision that Claimant is not disabled. The ALJ determined that the evidence showed Claimant could not perform the full range of light work because he had additional limitations. When these limitations were included in a hypothetical question to the vocational expert, the vocational expert identified a significant number of jobs in the national economy that Claimant can perform, including his past relevant work as a packer. (Tr. at 21-22.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit this Memorandum Opinion to all counsel of record.

ENTER:

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge

27